## CALLAHAN v. NESBITT (JOHNSON SERVICE CO., Intervener).

(Circuit Court of Appeals, Third Circuit. August 4, 1924.)

No. 3104.

1. **Patents** ⊚⇒75—Facts held to show dedication of invention to public.

Where, for purpose of promiscuous bidding of heating contractors for school building, plaintiff permitted publication of specifications for thermostatic control of dampers in ventilating units claimed by him as his invention, and contractors and school commissioners adopted specification, *held*, there was dedication of invention to public, under Rev. St. §§ 4886, 4920 (Comp. St. §§ 9430, 9466), notwithstanding that there was secret purpose to test invention.

2. **Patents** ⊚⇒328—1,390,758, for thermostatic control of dampers in unit ventilators, held invalid, as dedicated to public.

Callahan's patent, No. 1,390,758, for thermostatic control of dampers in unit ventilators in schools and public halls, *held* invalid by reason of prior use and sale, under Rev. St. §§ 4886, 4920 (Comp. St. §§ 9430, 9466).

Appeal from the District Court of the United States for the District of New Jersey; Joseph L. Bodine, Judge.

Suit in equity by Michael J. Callahan against John J. Nesbitt, in which the Johnson Service Company intervenes. From a decree dismissing the bill, plaintiff appeals. Affirmed.

McCarter & English, of Newark, N. J., and Charles McC. Chapman, of New York City, for appellant.

George A. Bourgeois, of Camden, N. J., and Harry Coulomb, of Atlantic City, N. J., for appellee Nesbitt.

Augustus B. Stoughton, of Philadelphia, Pa., for appellee Johnson Service Co.

Before WOOLLEY and DAVIS, Circuit Judges, and GIBSON, District Judge.

WOOLLEY, Circuit Judge. This is an appeal from a decree dismissing the bill in a suit for infringement of Letters Patent No. 1,390,758 granted the plaintiff for thermostatic control of dampers for unit ventilators of the kind installed in school rooms and public halls where it is desirable to have the air, in volume and temperature, automatically regulated by the temperature of the room. Claim 8 is typical of the claims in suit. It reads as follows:

. "A ventilating unit comprising a casing having a blower and motor chamber, an inlet thereto, a heating chamber below the motor chamber, an outlet chamber, and a bypass chamber between the heating and outlet chambers, in combination with a pivotally mounted damper for regulating the admission of air to the heating and by-pass chambers located at the entrance thereto, fluid means located in the outlet chamber and connections to the damper for actuating the latter, and thermostatic means located in the room where the apparatus is operating for controlling the action of the fluid means."

· The elements of this claim may be divided into two groups: (1) The ventilating unit, and (2) the thermostatic control. The elements of the first group comprise mechanism to draw in cold air and pass it over a heated radiator in one chamber, or pass it by the radiator in another chamber, or pass it through both chambers, and expel it into the room properly tempered. The elements of the second group concern means for thermostatically regulating the damper to direct the air shifts and control the result. All the elements are old. The device of the Geissinger patent No. 1,022,188 (1912) contains the blower chamber with the motor, the cold air inlet, the heating chamber, the by-pass chamber and outlet chamber, with a damper so adjusted as to force all or a part of the cold air into the heating chamber or by-pass all the cold air around it. The device of the Finegan patent No. 1,285,968 (1918) is singularly similar in structure and function to that of the patent in suit. The main difference is that in Finegan the by-pass chamber and outlet chamber are on opposite sides of the radiator, without partitions separating them, while in Callahan they are on the same side and are separated by partitions. There are still other units with the same elements differently arranged. In some the damper is controlled by hand. We doubt if invention is involved in substituting thermostatic control. Stilwell-Bierce Co. v. Eufaula Cotton Oil Co., 117 Fed. 415, 54 C. C. A. 584, certiorari denied, 189 U. S. 509, 23 Sup. Ct. 850, 47 L. Ed. 923. John E. Thropp's Sons Co. v. Frank A. Seiberling, 264 U. S. 320, 44 Sup. Ct. 346, 68 L. Ed. 708. We also doubt the presence of invention in what appears to be a mere change of form or juxtaposition of parts and the order in which they are used. Reckendorfer v. Faber, 92 U. S. 347, 23 L. Ed. 719.

There may be some improvement in this new arrangement of old elements, yet we fail to discern any distinctly new function. However this may be, the District Court based its decision on prior public use and sale under sections 4886 and 4920 of the Revised Statutes (Comp. St. §§ 9430, 9466), and the plaintiff concedes that the whole case turns on what is known in this litigation as the Waterbury construction. We shall therefore confine our discussion to this phase of the case.

Though vigorously controverted by the plaintiff, the Waterbury construction contains, we think, all the elements of the claims of the patent. In other words, the patent claims read on the Waterbury construction. In it, quoting the words of the claims, there is "a heating chamber below the motor chamber" and "a by-pass chamber between the heating and outlet chambers, in combination with a pivotally mounted damper for regulating the admission of air to the heating and by-pass chambers located at the entrance thereto." The specification and diagrams of the patent, however, disclose two differences. One is with respect to the damper which in the patented device is pivoted on the edge, a feature not mentioned in the claims, while the damper of the Waterbury construction is pivoted at the center. The function of each damper, however pivoted, is the same, that of directing air, wholly or partially, into or past one chamber or the other. The second difference is the position of these two chambers with respect to each other. The patent specification and diagrams show the by-pass chamber along side of the heating chamber; in the Waterbury construction the by-pass chamber is partly alongside and partly above the heating chamber, both being below the motor chamber as the claims require. In these structural differences no difference of function is involved, although perhaps the Callahan device produces a bet-

ter mixture of air of different temperatures. This, however, is not certain.

The Waterbury construction came into view in this way: In April, 1917, the City of Waterbury, Connecticut, contemplated installing ventilating units in one of its school buildings. Louis A. Walsh, an architect, asked the Peerless Unit Ventilation Company, Inc., for a heating layout for four class rooms. Callahan, later the patentee, was associated with this company. After correspondence, the extent of which is not in evidence, Walsh called for bids on specifications covering precisely the structure later installed and herein known as the Waterbury construction.

A general contract for heating was awarded Daly Bros. A subcontract for ventilating units was let to Peerless Unit Ventilation Co., Inc., and a contract for the thermostatic control was let to Johnson Service Co., the intervening defendant. Four units were built under Callahan's superintendence and installed and the purchase price of about $2,000 paid. More than two years later—May 13, 1920—Callahan applied for a patent. In due course he was granted the patent on which he now is prosecuting this suit for infringement. He was at once confronted with the Waterbury construction as a prior public use and sale. His reply was that that construction was purely experimental and in consequence did not bar his right to a patent for his invention, under the familiar law of Elizabeth v. Pavement Co., 97 U. S. 126, 24 L. Ed. 1000, and kindred cases. Here is the issue.

[1, 2] Regarding, as we do, the Waterbury construction and the device of the patent similar in structure and alike in function, the plaintiff has failed to explain satisfactorily the manner in which the Waterbury construction first came to light in the architect's specifications asking for bids. As we have said, these specifications disclosed the structure later installed. No one knows who drew them. If they were Walsh's specifications and therefore his conception or the conception of any third person, then clearly they form no part of Callahan's invention and, accordingly, they became prior art as to him. The step from the Waterbury construction to the device of the patent is too short to involve invention. If the specifications were Callahan's conception, he permitted their publication for promiscuous bidding of heating contractors. In other words, he disclosed his invention to the public, and the public——contractors and school commissioners—adopted it, paid for it and used it. Unless there was something more, this was a dedication of the invention to the public. But the plaintiff maintains that the Waterbury use of the invention was purely experimental, that the invention was then in its early stage and was not perfected until more than two years later when he applied for a patent. We find nothing said or done by Callahan during this period which indicates an experimental use. True, he inspected the units from time to time, yet to all visible intents and purposes he, or his concern, made an outright sale. Against such a business transaction a secret purpose to test the invention, one presently existing or later arising in the mind of the inventor, can not prevail. There must be evidence of the need and of the fact of experimentation to bring it within the exception to the law of prior use. We find no such evidence. Therefore we are constrained to affirm the decree dismissing the bill.